JAMES McWILLIAMS BLUE LINE, Inc. et al. v. UNITED STATES et al.

United States District Court
S. D. New York.
Sept. 24, 1951.

Lord, Day & Lord, New York City, for plaintiffs James McWilliams Blue Line, Inc., T. A. D. Jones & Co. Inc. and Hartford Electric Light Co.

Knox, Matthews & Lishman, New York City (Parker McCollester, Robert W. Knox, and Frank J. Clark, all of New York City, of counsel), for plaintiffs Wyatt, Inc. and United Illuminating Co.

John H. D. Wigger, Special Asst. to the Atty. Gen., H. G. Morison, Asst. Atty. Gen., James E. Kilday, and John F. Baecher, Special Assts. to the Atty. Gen., and Irving H. Saypol, U. S. Atty., New York City, for United States of America.

Daniel W. Knowlton, Chief Counsel, H. L. Underwood, Asst. Chief Counsel, Washington, D. C., for intervenor-defendant Interstate Commerce Commission.

Francis L. Brown, J. Edgar McDonald, Bernard Sobol, and Conboy, Hewitt, O'Brien & Boardman, all of New York City (Hewitt Biactt, Richmond, Va., Henry O. Boynton, Philadelphia, Pa., Rowland L. Davis, Jr., New York City, Neal J. Holland, Boston, Mass., E. A. Kaier, Philadelphia, Pa., Martin A. Meyer, Jr., Washington, D. C., H. Merle Mulloy, Philadelphia, Pa., John R. Wall, Washington, D. C., and J. P. Fishwick, New York City, of counsel), for Intervening Railroads.

Before SWAN, Circuit Judge, and RYAN and SAMUEL H. KAUFMAN, District Judges.

RYAN, District Judge.

This suit is filed under Sections 1336, 1398, 2321, 2322 and 2323 of the United States Code, Title 28, which provide for suits to enjoin, set aside, annul and suspend orders of the Interstate Commerce Commission. It came on to be heard before a specially constituted court, pursuant to the provisions of Title 28 U.S.C. §§ 2284 and 2321–2325. The complaint prays judgment setting aside, and enjoining enforcement, of an order of the Commission, entered June 5, 1950,[1] which, by a six-to-five vote of the Commission, dismissed the complaint in a proceeding before it, Docket No. 30122, James McWilliams Blue Line, Inc. et al. v. Campbell's Creek Railroad Company, et. al., 278 I.C.C. 312.

No material issue of fact has been raised by the pleadings.

We find that this court has jurisdiction of the subject matter of this suit, that the amount in controversy exceeds the sum of $3,000 exclusive of interest and costs, and that venue is properly laid because plaintiff "Blue Line" has its principal office within this district. 28 U.S.C. § 1398.

The complaint before the Commission assailed rates and practices affecting the transportation of rail-ocean-barge coal, by the so-called Pocahontas[2] Railroads from mines in Virginia, West Virginia and Kentucky to Hampton Roads ports, which coal is subsequently moved by ocean to New England ports and thence by barge to interior ports. The rates, which are proportional rates, are 45 cents per ton higher than proportional rates on like coal which is moved by ocean to New England ports, and thence by rail (rail-ocean-rail coal).

In the proceeding before the Commission, the complainants (plaintiffs herein) con-

---

1. The order of the Commission was issued on June 5, 1950; however, by a second order of January 8, 1951, the Commission denied the plaintiffs' petition for reconsideration and reargument.

2. The Chesapeake and Ohio Railway Company, Norfolk and Western Railway Company, and The Virginian Railway Company.

In addition to these three "Pocahontas" lines, because they participate in transporting coal from various mines, the following were named as defendants before the Commission: Campbell's Creek Railroad Company, The Kanawka Central Railway Company, Kanawka Glen Jean and Eastern Railroad Company, Kelly's Creek and North Western Railroad Company, Kelly's Creek Railroad Company, The New York Central Railroad Company and Winifrede Railroad Company.

tended that the rates so established are unlawful and in violation of the provisions of Sections 2, 3(1) and 3(4) of the Interstate Commerce Act,[3] particularly when read in light of the National Transportation Policy as set forth in the Transportation Act of 1940, which amended the Interstate Commerce Act, 49 U.S.C.A. notes preceding Sections 1, 301, 901 and 1001.[4]

We have concluded that the order of the Commission dismissing the complaint filed before it by the plaintiffs herein was erroneous, that the rates complained of are discriminatory and unlawful, and that the continued establishment and enforcement of those rates must be enjoined.

Plaintiff, James McWilliams Blue Line, Inc. ("Blue Line") is a New Jersey corporation, with its principal office at No. 1 Broadway, New York, N. Y. "Blue Line" is a common carrier by water in interstate commerce; it holds a certificate of convenience and necessity, issued to it by the Commission pursuant to Section 309 of the Interstate Commerce Act, 49 U.S.C.A. § 909, to engage, subject to said Act, as a common carrier by water in the interstate transportation of commodities generally by water. "Blue Line" is in competition with the New York, New Haven and Hartford Railroad for the movement of coal from New Haven to ultimate destinations in New England.

Plaintiffs T. A. D. Jones & Co. Inc. and Wyatt, Inc. are Connecticut corporations with their principal offices at New Haven, Connecticut. They are engaged in buying and selling coal; each has at New Haven yards, docks and facilities which enable it to receive and tranship coal for transportation to points beyond either by water or by rail. Both sell and ship coal to customers throughout New England; included among their customers are plaintiffs, the Hartford Electric Light Co. and United Illuminating Company, public service utility companies of Connecticut, which in their production and sale of electric energy use large quantities of coal.

United States of America, named as defendant, joins in the prayer of the plaintiffs and asks that the relief sought in the complaint be granted.

The Pocahontas railroads and a group of northern railroads were, on their petitions, granted permission to intervene in this suit.[5] The answers of the railroads, while putting in issue no material allegation

3. Section 2, 49 U.S.C.A. § 2, declares it is unlawful to charge one person more than another for a "like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions".

Section 3(1), 49 U.S.C.A. § 3(1), declares unlawful "any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic, in any respect whatsoever" or to subject any of the above "to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

Section 3(4), 49 U.S.C.A. § 3(4), provides that rail carriers "shall not discriminate in their rates, fares, and charges between connecting lines * * *. As used in this paragraph the term 'connecting line' means the connecting line of any carrier subject to the provisions of this part or any common carrier by water subject to Part III."

4. The National Transportation policy is set forth in the Transportation Act of

1940, which amended the Interstate Commerce Act, 49 U.S.C.A. notes preceding Sections 1, 301, 901 and 1001; that policy expresses the Congressional mandate that "All of the provisions of this Act shall be administered and enforced with a view to carrying out" the policy there expressed. The policy goes on to state that it is the will of Congress "to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; * * * to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices".

5. The Northern railroads were also granted permission to intervene in the proceedings before the Commission. They are: The Baltimore and Ohio Railroad Company, Boston and Maine Railroad, The Central Railroad Company of New Jersey, Central Railroad Company of Pennsylvania, The Delaware and Hudson Railroad Corporation, The Delaware, Lacka-

of the complaint, do assert the legality of the assailed rates and ask for a dismissal of the complaint.

The controversy before us had its genesis in petitions filed by the railroads with the Commission at various times since 1937 asking for authority to make general increases in their freight rates.[6] As an outgrowth of these ex parte proceedings, the Commission adopted and applied the "single increase rule" and used percentages, or graded increases, subject to maxima, or hold-downs. The Commission permitted the railroads to increase their rates by 90 cents per gross ton on coal destined for routing through a New England port city, and irrespective of whether the coal moved via a rail-ocean-rail route or via a rail-ocean-barge route. Such an increase would, of course, apply to coal moving through New Haven to a point of ultimate destination in New England from either the northern or southern coal fields. In application, the increase granted was restricted to, and divided among, the railroads involved. The factual situation which resulted is shown by taking the rate of $3.42 per gross ton, which, at the time of the complaint, was published by the Pocahontas railroads as their initial charge for transporting coal from certain mines to the Hampton Roads ports. This rate was collected in the first instance by the Pocahontas roads on all coal transported to Hampton Roads and destined to New Haven. The tariffs provided, however, that if the coal was subsequently moved by railroad from a New England port to the point of ultimate destination, the Pocahontas roads, upon receipt of certification to that effect, would refund 45 cents per ton, leaving them a net charge for their transportation from mines to Hampton Roads of $2.97 per ton. No refund is provided, however, if the coal was subsequently moved from a New England port to the same destination by water carrier. There was created a differential in charges for the rail transportation service from the mines to Hampton Roads ports dependent not upon any difference in rail service, but solely upon the method of subsequent movement to ultimate destination.

Before the Commission, the Pocahontas railroads conceded that it does not cost them any more to transport coal from the mines to Hampton Roads when such coal reaches its final destination in New England by barge than when it reaches its final destination by rail. The services they furnish to shippers are the same in each instance.

A large part of the coal dealt in by Jones & Co. and Wyatt, and purchased and used by Hartford Electric and United Illuminating, consists of bituminous coal originating at mines in the Pocahontas District. This coal is transported by the Pocahontas railroads by rail from the mines to the Hampton Roads ports. Thence, it is carried by ocean carriers to the New Haven docks of Jones & Co. and of Wyatt, from whence it is transhipped for movement to points of ultimate delivery in New England. The receipt and further shipment of coal by them by water is cheaper and more economical than by rail, and they have established facilities representing substantial investments designed to handle coal by water.

wanna and Western Railroad Company, Erie Railroad Company, Lehigh and New England Railroad Company, Lehigh Valley Railroad Company, Maine Central Railroad Company, The Monongahela Railway Company, Montour Railroad Company, the New York, New Haven and Hartford Railroad Company, New York, Ontario and Western Railway Company, New York, Susquehanna & Western Railroad Company, The Pennsylvania Railroad Company, The Pittsburgh & Shawmut Railroad Company, The Pittsburgh and Lake Erie Railroad Company, Reading Company, Western Maryland Railway Company.

6. The proceedings which are pertinent here were designated by the Commission as Ex parte 115. (General Commodity Rate Increases, 1927, 223 I.C.C. 657, 229 I.C.C. 435), No. 162 (Increased Railway Rates, Fares, and Charges, 1946, 266 I.C.C. 537; 268 I.C.C. 169; 269 I.C.C. 418; 269 I.C.C. 418; 273 I.C.C. 445; 274 I.C.C. 168; and No. 163 (Increased Freight Rates, 1947, 269 I.C.C. 33; 270 I.C.C. 81; 270 I.C.C. 93; 270 I.C.C. 403).

We do not accept the finding of the Commission that "there are no parties subjected to unjust discrimination or undue prejudice as the complaining and intervening operator-dealers forward coal and the complaining and intervening public utilities receive coal, by both rail and barge, and are accorded the same proportional rates and refunds."[7]  Such a finding seems to us clearly erroneous and not supported by any substantial evidence.[8]

However, quite apart from this, we hold that the rates complained of are unlawful because in violation of Section 2 of the Interstate Commerce Act, 49 U.S.C.A. § 2. We find it unnecessary, therefore, to determine the legality of these rates under Sections 3(1) and 3(4) of the Act.

We are unable to distinguish the instant case from I. C. C. v. Mechling, 1946, 330 U.S. 567, 67 S.Ct. 894, 91 L.Ed. 1102. There the order of the Commission permitted the railroads to charge higher reshipment rates (3 cents per 100 lbs.) east from Chicago for grain brought to Chicago by barge than for ex-lake or ex-rail grain. The enforcement of the order was enjoined to the extent that it permitted this extra charge.

The only factual difference between the Mechling case and the case at bar is that in the Mechling case the rates charged for rail transportation were dependent upon the means used to accomplish the prior movement of the shipment, while here the rates are made dependent upon the means used to accomplish the subsequent movement of the shipment.  This difference is of no moment.  It has been settled with respect to the provisions of Section 2 of the Act prohibiting different charges by a common carrier for "a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions" that "* * * the clause did not allow car-riers by railroad to make a difference in rates because of differences in circumstances arising either before the service of the carrier began or after it was terminated."[9]

In Wight v. United States, 1896, 167 U.S. 512, page 517, 17 S.Ct. 822, 823, 42 L.Ed. 258, Mr. Justice Brewer wrote of this section: "The wrong prohibited by the section is a discrimination between shippers.  It was designed to compel every carrier to give equal rights to all shippers over its own road, and to forbid it by any device to enforce higher charges against one than another."

And further that: "It was the purpose of the section to enforce equality between shippers, and it prohibits any rebate or other device by which two shippers, shipping over the same line, the same distance, under the same circumstances of carriage, are compelled to pay different prices therefor."  167 U.S. at page 518, 17 S.Ct. at page 824, 42 L.Ed. 258.

Nor are we impressed by the attempt of the Commission to distinguish this case from the Mechling case because the Commission cannot regulate "Blue Line's" barge rates.  That was true, at least as to part of the ex-barge grain in the Mechling case; however, as we read the Mechling case, the decision was not based upon the existence of jurisdiction in the Commission to regulate the barge rates on the grain traffic and was reached quite independently of such jurisdiction.

Of the objection, that dire consequences will follow a reversal of the Commission's order and the consequent disruption of the rate structure, we note that of a similar contention made by the Commission in the Mechling case, it was said that "The possibility of such a disruption does not remotely justify discriminations against barge traffic which actually deprive shippers and the barge companies

---

7. Report of Commission, June 5, 1950, Sheet 10.

8. Cf. Universal Camera Corp. v. Labor Bd., 340 U.S. 474, 71 S.Ct. 456; N.L.R.B. v. Universal Camera Corporation, 2 Cir., 190 F.2d 429.

9. Interstate Commerce Comm. v. Delaware, L. & W. R. Co., 1910, 220 U.S. 235, 253-254, 31 S.Ct. 392, 398, 55 L.Ed. 448.

 

of the inherent advantages of water transportation guaranteed to them by Congress. See United States v. Chicago, M. & St. P. R. Co., 294 U.S. 499, 506–510, 55 S.Ct. 462, 465–467, 79 L.Ed. 1023." I. C. C. v. Mechling, supra, 330 U.S. page 580, 67 S.Ct. at page 901, 91 L.Ed. 1102.

The relief prayed for by the plaintiffs must be granted and a judgment may be submitted on notice providing that the order of the Commission of June 5, 1950, dismissing the complaint before it be vacated and set aside, directing the Commission to make and enter an appropriate order ending the practice complained of and enjoining the Commission from further continuing and enforcing the practices and rates now in effect.